**ELEVATOR SUPPLIES CO., Inc., v. GRAHAM & NORTON CO., et al.**

District Court, D. Delaware. June 10, 1929.

No. 629.

See, also, 33 F.(2d) 146, 153.

E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., and Samuel E. Darby, Jr. (of Darby & Darby), of New York City, for plaintiff.

William G. Mahaffy, of Wilmington, Del., and Clifton V. Edwards (of Edwards, Bower & Pool), of New York City, and Henry C. Townsend and Virgil C. Kline (of Townsend & Decker), both of New York City, for defendants.

MORRIS, District Judge. Two patents are here in suit. Both have to do with the elevator art. One, No. 1,587,007, granted to Norton and others, is for shaftway "door-operating mechanism for elevators." The other, No. 1,565,143, to Fear is for "elevator-door control." Both are owned by the plaintiff, Elevator Supplies Company, Inc., which here taxes defendant Graham & Norton Company with their infringement. The defense to each is noninfringement, in that the claims cannot be given a scope broad enough to dominate defendant's device without making them read with equal or greater precision upon devices of the prior art, and in that defendant does not make use of all the elements of the claims.

The Norton patent was applied for October 11, 1921, and was granted June 1, 1926. It has for its general object improvements in devices for automatically operating the shaftway door, at which the car is stopping or stopped, without opening or unlocking any other door of the shaftway. The opening of the desired door is brought about without special attention on the part of the operator; it being necessary only that he move to neutral position the lever by which the movements of the car are controlled. In its travel up and down the hatchway, the car makes no contact with the door opening mechanism at any floor other than that at which the car stops. The constant noise and wear incident to such contacts are thus avoided. The specification states: "* * * A door operating line is provided for operating all of the doors and means is provided for connecting any one of the doors with the line for movement therewith and certain features of the invention relate particularly to the mechanism for connecting the doors with said line and the means for controlling said mechanism." The door-operating line consists of an endless cable passing round a pulley on a motor-driven shafting in the penthouse above the elevator well and round another pulley at the bottom of the well. Buttons or blocks are affixed to the line at proper intervals. The shaftway doors move vertically. Each is divided about midway its height. The two parts are connected by cables passing over pulleys in such manner that the downward movement of the lower part raises the upper.

The downward movement of the lower part is brought about by connecting it with the door operating line. The connecting mechanism consists of a bell crank lever secured to a rock shaft turning in a bracket affixed to the lower part of the door. While the car is running, this lever is held by a spring out of engagement with the operating line. But, when the car stops opposite any door, a toggle lever, carried by a cable suspended in the shaftway, co-operates, through a connected swinging lever, with a stationary cam affixed to the car, and moves the upper part of the bell crank lever doorward. This causes the lower part of the lever, which is hook shaped and forked, to straddle the line and engage one of the buttons thereon. The cable carries a toggle lever for each door and a weight at its lower end. Its upper end is attached, in the penthouse, to one end of a lever fulcrumed at its center. While the car is running, the cable is held in an elevated position by the pull, on the opposite end of the cable supporting lever, of an electromagnetic device connected with the hoisting motor circuit. When the car control lever is put in neutral position to stop the car, this device is de-energized. Thereupon the weight at the end of the cable pulls the cable downward, straightens the knees of the toggle joints, and operates a switch which starts the door-operating line motor. As movement of the bell crank levers on the shaftway doors is resisted by a small spring, and as the lever to which the other end of the toggle is connected moves freely, unless opposed by the car carried cam, the straightening of the toggles puts into engagement with the door-operating line the bell crank lever only of the door opposite which the car is stopped.

The claims in issue are 6, 15, 16, 17, 20, 27, 28, 29, and 30. They are divisible into three groups, of which claims 6, 15, and 27 are typical. These claims are:

"6. An elevator mechanism having in combination a hatchway, a series of doors for said hatchway, a car, car hoisting means, means for operating the doors and means thrown into operation automatically upon stopping the car and means controlled by the car cooperating to cause the operation of the door at which the car is stopped while the other doors remain closed."

"15. An elevator mechanism having in combination a hatchway, a series of doors for said hatchway, a car, car hoisting means, means for controlling the hoisting means to start and stop the car, means for operating the doors, a single electro-magnetic device, means controlled by said electro-magnetic de-

vice and means controlled by the car cooperating to cause the opening of the door at the floor at which the car is stopped while the other doors remain closed."

"27. In combination a hatchway, floor landings and gates along said hatchway at the several floors, a car and car hoisting means, a hand controller therefor, gate operating mechanism comprising a movable member at each of said floors, a contact member on the car and means comprising an electro-magnetic device common to all the gates and arranged to co-operate with said contact member to actuate the movable member upon moving the said controller to neutral position."

Defendant's alleged infringing device accomplishes the same general results as the door-operating mechanism of Norton. But these results were not new with the patentees. Rowntree, as is disclosed by his patent, No. 520,833, had arrived at the identical goal 30 years before. In 1919 Phillips showed in his patent, No. 1,299,220, means for the accomplishment of the same object. Consequently, if the claims are to be upheld, and it is not disputed they may be, if properly interpreted, defendant's mechanism may not be brought within their scope by a construction that would make them embrace devices functioning in the same way to produce the same result, disclosed in any patent of an earlier effective date.

Defendant employs at each floor a cylinder and piston actuated by fluid pressure to operate the opening levers permanently connecting the piston and doors. Its cylinders or pneumatic engines are under control of a valve shiftable, so as to open the well door opposite the car, by an arm or throttle lever projecting into the shaftway, but not far enough to come into contact with the car. To shift the valve to open the door opposite the car, a projectable contact piece or cam is attached to the car in a position enabling it when projected, to make contact with and move the throttle of the shaftway door engine. While the car is running, the cam is held in an inoperative position by the pull of the cable attached to a car carried torque motor connected with the circuit of the hoisting motor. When the hoisting motor circuit is broken to stop the motor by placing the car control lever in neutral position, the torque motor is de-energized, and ceases its retracting pull on the cam. Thereupon a spring projects the cam into position to make contact with and shift the throttle lever.

Rowntree patent No. 520,833 not only accomplished the same result, but did so by the identical means, save that his connection between car control lever and projectable cam was mechanical, not electrical. His mechanical connection, like the electrical connection of defendant, served to hold the cam out of engagement with the shaftway door engine throttle levers while the car was running, and permitted a spring to project the cam into contact position when the car control lever was moved to neutral position.

But defendant was not even the first to employ a car-carried projectable cam controlled by a single electromagnetic device. As early as 1910, patent No. 964,891 to Westlin disclosed a car equipped with torque motor, movable cam, and spring functioning in the same manner as do those devices on the car of defendant. The Westlin motor was energized when current was supplied to the hoisting motor and de-energized when current was cut from the main motor to bring the car to rest opposite a floor landing. As a consequence, the cam was automatically held in its retracted position as the car moved past the several shaftway doors, and was moved by spring action outwardly into engaging position with a lever projecting into the shaftway only when the car was stopped or stopping. The lever, extending into the shaftway shown by Westlin, was, however, a door-latch operating lever, not one to operate the throttle valve of a pneumatic door engine. But one is moved or shifted as easily and in the same manner as the other. In the construction of his device, defendant merely substituted the electromagnetic cam controlling means of Westlin for the mechanical cam controlling means of Rowntree or, otherwise stated, defendant merely brought together the shaftway door equipment of Rowntree and the car equipment of Westlin. If this was obvious to one skilled in the elevator art, was the substitution of equivalents, or if the united devices constituted an aggregation, not a combination, then, of course, the Norton patent, regardless of the wording of its claims, Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136, cannot dominate defendant's mechanism. But it is not necessary to decide whether defendant's act involved invention, for in 1919 Phillips disclosed in his patent, No. 1,299,-220, shaftway door-opening mechanism that stands as a complete bar to any finding of infringement of the claims in suit by defendant's mechanism. His specification states: "My invention is adapted for use on elevators where the gates are operated by a separate machine. A draw bar 1 runs the full length of the shaft and this draw bar is ver-

tically movable by the before mentioned machine. Slots 2 are cut in the draw bar at each floor and a shoe 3, carried by the car is used to press a pawl 4 into the slot to raise the gate. These elements are well known in the art and will not be described in detail. My invention relates to means for automatically moving the shoe into position to strike the pawls when the car stops at any particular floor, the said shoe being normally out of contact with the pawls. * * * A solenoid 8 is suitably connected with the car between the arms, and the coil of this solenoid is electrically connected with the starting and stopping mechanism of the car. * * * It will be seen that when the solenoid is deenergized the spring will force the shoe outwardly away from the car, when said shoe will be in a position to engage the pawls to force them into engagement with the gates. As soon as the car is started the solenoid will be energized so that the core will be drawn inwardly to move the arms against the tension of the spring and thus move the shoe into inoperative position. By my invention the car will run smoothly without noise and the shoe and pawls are not subject to wear."

As any interpretation of the claims of the Norton patent that will subject defendant's device to their monopoly will at the same time obviously bring the mechanism disclosed by Phillips within their scope, the finding must be one of noninfringement without regard to the precise extent to which the claims are limited or to the precise differences in mode of operation existing between the device of the patentees and that of the defendant.

The Fear patent in suit also relates to elevator door-operating mechanism, and more particularly to the automatic control of that mechanism. Fear's specification states that one object of his invention is to provide gate-operating mechanism that will shorten the time spent after the car reaches the landing in operating the gates, thereby lessening the time required for a round-trip of the car, and that another object is to provide controlling means for the gate-operating mechanism which wholly eliminates the temptation of the car operator to open the car door prematurely, and yet enables the car to make as good time as if no car gates were employed. To accomplish these objects, the patentee removes from the operator "the duty to open the gates as the car stops at a landing," and provides "automatic means to control the opening of the gates at the proper time." The mechanism disclosed consists of a pneumatic engine for each shaftway door and another, on the car, for the car door. The car door engine and that for the shaftway door of the landing at which the car stops are put into operation simultaneously by electromagnetically actuated means consisting of a car-carried rod, Figure 3, the upper end of which is eccentrically mounted on a disc attached to the end of the shaft of the electromagnetic device, 34, carried at the top of the car. The lower end of the rod is pivotally connected with the throttle lever of the car door engine. A projectable cam is so connected to the rod and the car that the stroke of the rod opening the throttle valve of the car door engine projects the cam against the trip that opens the throttle of the shaftway door engine. The reverse stroke of the rod closes the valve of the car door engine. It likewise retracts the cam, and thereby brings about the closing of the valve of the shaftway door engine. To cause the motor shaft to which the rod is eccentrically connected to make the partial revolution necessary to give the rod its thrust or stroke, two acts must occur—two circuits must be completed for which additional means are provided. The first is completed by the placing of the car control lever in neutral position. This brings about the closing of the contacts 80 and 81. But the rod actuating motor, 34, is not thereby energized. It is not in that circuit. Were it otherwise, the car door would be automatically opened, even if the car were stopped between floors. This, it was the purpose of the patentee, as I understand the specification and the record, to prevent. Consequently, the closing of this circuit serves but to energize another electromagnetic device, 19, beneath the car. This device controls a lever, 66, co-operating, when the car stops at a floor landing, with a stationary cam affixed to the front of the shaftway. While the car is running and the device 19 remains de-energized, lever 66 is held in an inoperative position out of contact with the cams at the several floors. But when device 19 is energized by placing the car control lever in neutral position, lever 66 swings outward into position to engage the cam at the floor approached. Its engagement with the cam closes the contacts 60 and 65 to complete the rod actuating motor circuit.

Plaintiff contends that Fear improved upon Norton, and that his improvements reside in his adapting the system to the compressed air or pneumatic door engines and in his applying the system to the double door arrangement—hatchway door and car door. Defendant takes the position that the pith of the invention is to be found in the device 19 and arm 66 which control the opening of the

gates at the proper time—as the car stops at a landing—yet wholly eliminate the temptation of the operator to open the gates prematurely.

The claims in issue are 8, 9, and 17 to 22, inclusive. Of these 8 and 17 are conceded to be adequately illustrative. They read thus:

"8. In combination, a hatchway having floor landings, a car, a hoisting motor and means to cut out the same, a gate at each landing, a gate on the car, and engine individual to each gate to operate each gate, electromagnetically actuated means to control the car gate engine and the engine at the landing which the car is near, and means operated automatically when the car comes within a predetermined distance from a landing with the motor cut out for operating said electromagnetically actuated controlling means to open the gates."

"17. In combination a hatchway having floor landings, gates at the landings, a fluid pressure device controlling each gate, a valve for each device, a car and hoisting means, a controller therefor, a cam on each car for actuating said valve and electromagnetically controlled means brought into operation in the neutral position of said controller to move said cam into operative position."

Defendant's mechanism has, in addition to the elements hereinbefore described while considering its relation to the Norton patent, a car door or gate operated by a pneumatic engine, carried on the car, whose throttle valve is actuated by a rod secured to the levers through which the projection of the cam to operate the throttle of the shaftway door engine is effected. Defendant does not employ the electromagnetic device 19, its associated levers, or co-operating stationary cams. Consequently, defendant's car doors are opened whenever and wherever the car is stopped. Plaintiff asserts that the claims in issue are broad enough to cover mechanism so constructed and so operating. Defendant replies that, if they are broad enough to dominate mechanism not embodying device 19, arm 66, and cams 18, they are too broad, and are invalid, not only for want of disclosure, but as well for covering both an aggregation of devices of the prior art and certain specific anticipating mechanism.

The employment of a door at each landing, a door on the car, and a pneumatic engine individual to each gate to operate each gate, was by no means new with Fear. Moreover, the car door engine and the opposite hatchway door engine had long been simultaneously put into operation by means of a shiftable cam and a rod or lever jointly ma-

nipulated by a hand or foot treadle. Rowntree patent No. 931,224, granted in 1909, had shown such mechanism and mode of operation. Rowntree patent No. 520,833 had shown the availability of a movable cam to shift the throttle valve of a pneumatic engine for an elevator door. Westlin's patent, No. 964,891, had disclosed an electromagnetically actuated cam. Phillips' patent, No. 1,299,-220, had pointed out the availability of an electromagnetically actuated cam for elevator door operation. True, none of these devices was an anticipation of Fear's, but the field for the inventor had been greatly narrowed, and the opportunities for the man skilled in the art multiplied. Considering the state of the art, a characterization of defendant's substitution of the Westlin torque motor and its associated chain or cord, 15, for the heel of the operator and the rod, 34, of Rowntree's patent No. 931,224, as invention, would seem an infamous reflection upon "the man skilled in the art."

Moreover, defendant completed the elevator installation in the Otis Office Building in New York about March, 1924. A torque motor was there employed. It was energized and de-energized with the hoisting motor, so that the car doors as well as the landing doors were automatically opened by pneumatic motors when the elevator was stopped at or adjacent a landing. The Fear application was not filed until October 6, 1924. But plaintiff shows that an installation not employing device 19 and its associated arms and cams was made on the third floor of plaintiff's building as early as February, 1923. By that fact, plaintiff seeks to establish for Fear's patent an effective date earlier than that of the Otis Building installation; but, since Fear's specification, filed nearly two years after the installation in plaintiff's building, contains no express or implied disclosure of apparatus not employing device 19 with its associated arms and cams, I am of the opinion that plaintiff's earlier installation of mechanism of that character is but a confirmation of the view, gleaned from the specification and drawing, that the pith of the Fear invention is device 19. The elimination of that device from the Fear mechanism and the thought of so doing, to convert its mode of operation into that employed by defendant, would, it seems to me, be even more difficult for "the man skilled in the art" than the bringing into operative relation of the devices of Westlin and Rowntree.

I think the concluding clause of claim 8 and the concluding clause of claim 17 read easily and readily upon the disclosed mecha-

nism. Any reading thereof upon mechanism omitting device *19* and its associated levers and stationary cams would, I think, be unwarrantably strained. Consequently, I find that the Fear claims in issue are not infringed by defendant's apparatus.

The bill of complaint must be dismissed.

